**Marc P. Berger**
**Lara Shalov Mehraban**
**George N. Stepaniuk**
**Christopher J. Dunnigan**
**Ladan F. Stewart**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0061 (Dunnigan)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) **COMPLAINT** |
| v. | ) ) **19 Civ. 6037 (UA)** |
| PAUL ANDREWS RINFRET and PLANDOME PARTNERS LLC | ) ) **JURY TRIAL DEMANDED** |
| Defendants, | ) ) ) |
| and | ) ) |
| PLANDOME PARTNERS LP | ) ) |
| Relief Defendant. | ) ) |

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

Defendants Paul Andrews Rinfret ("Rinfret") and Plandome Partners LLC ("Plandome LLC"

and, together with Rinfret, "Defendants"), and Relief Defendant Plandome Partners LP

("Plandome" or "Relief Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      For over five years, Rinfret perpetrated a brazen, multimillion dollar offering fraud scheme, defrauding investors by telling them that they would be investing in a successful trading strategy with a proven track record.  What the investors did not know is that Rinfret was in fact an unsuccessful trader, and was employing a carefully crafted web of lies and deception to raise millions of dollars with the intention of using the proceeds to enrich himself and his family.

2.      From late 2013 through December 2018, Rinfret defrauded at least five individuals out of a total of $19.3 million by selling them limited partnership interests in Plandome, a purported investment fund operated by Rinfret and Plandome LLC.  Rinfret told the investors that their money would be used by Plandome to conduct trading in S&P 500 futures contracts and foreign currency.  But Rinfret lied to the investors about, among other things, the current performance and historical track record of Plandome's purported trading strategy, its assets under management, and what Rinfret actually planned to do with the investors' money.

3.      Rinfret told the investors that since January 2012, Plandome had been using a proprietary algorithm to day-trade S&P 500 futures contracts, and that this trading strategy had been extremely successful.  Rinfret boasted to investors that the trading strategy had generated triple-digit returns as high as 362% for Plandome investors over a multi-year period, and that Plandome had never lost money in a single month since 2012.  Rinfret further claimed that Plandome had approximately $25 million in assets under management.

4.      These statements were all false.  Rinfret's trading strategy did not have a track record of any kind going back to January 2012.  The small amount of S&P futures trading Rinfret actually did with investor funds was unsuccessful; Rinfret's trading lost money month after month.  And Rinfret did not manage $25 million, or any amount close to that, at the time he

solicited these investors.

5.      In reality, Rinfret simply stole much of the money that Plandome received from investors, using millions of dollars of investor funds to pay for personal living expenses and extravagant vacation rentals, lavish parties, jewelry and other luxury goods, make payments to family members, and pay back earlier investors who sought redemptions.

6.      To cover up his scheme and obtain additional investments, Rinfret sent investors fabricated monthly account statements showing large profits from trading that either never occurred or had in fact resulted in substantial losses.

7.      In 2019, Rinfret's scheme collapsed.  Faced with millions of dollars in redemption requests, Rinfret admitted part of his fraud to at least two investors.  He told them that he had lost all of Plandome's money trading and that the proprietary algorithm had never worked. Rinfret also admitted that he had sent falsified account statements to investors each month. Rinfret did not tell these investors that he had, in fact, misappropriated much of their money.

## **VIOLATIONS**

8.      By engaging in the conduct set forth in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §§ 78u(d)(1)].  The Commission seeks a final judgment: (i) permanently enjoining Defendants from engaging in the acts, practices, transactions and courses of business alleged herein; (ii) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (iii) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (iv) ordering Relief Defendant to disgorge any ill-gotten gains plus prejudgment interest thereon, and (iv) ordering such other and further relief the Court may find appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  A substantial part of the events or omissions giving rise to the claims herein occurred in the Southern District of New York, including false and misleading statements made to investors

and other fraudulent conduct in furtherance of the Defendants' scheme.

## DEFENDANTS

13.     **Rinfret**, age 70, is a resident of Manhasset, New York.  From 1989 to 2005,

Rinfret was associated with a number of broker-dealers registered with the Commission.

14.     **Plandome LLC** purports to be a New York limited liability company.  From at

least in or about February 2018 to the present, Plandome LLC was the general partner of

Plandome and purportedly responsible for the overall management of Plandome's investment

portfolio.  Rinfret is the founder and managing member of Plandome LLC.  Rinfret is

responsible for managing Plandome LLC's business and has authority to act on behalf of

Plandome LLC.

## RELIEF DEFENDANT

15.     **Plandome** is a New York limited partnership organized in 2011, and is purported

to be an investment fund.  According to Plandome's offering memorandum and limited

partnership agreement with investors starting in 2018, Plandome LLC is the fund's general

partner, and each investor is a limited partner in Plandome.  Rinfret is identified in those

documents as Plandome's Chief Investment Officer and Portfolio Manager.  The limited

partnership agreement between Plandome LLC as general partner and the investors as limited

partners states that "[t]he management and control of the Partnership shall be vested exclusively

in the General Partner" and that "[t]he Limited Partners shall have no part in the management of

the Partnership and shall have no authority to act on behalf of the Partnership in connection with

any matter."  Prior to 2018, Plandome's limited partnership agreements with investors listed

Rinfret as general partner, and similarly stated that the general partner had "responsibility for all

trading, trading system design and all business matters."  These agreements further provided that

Rinfret, as general partner, would be compensated on a per month basis with 25% of all net proceeds in the partnership account.  Similarly, the 2018 Plandome offering memorandum provided that Plandome LLC, as general partner, was entitled to a "Performance Allocation" at the end of each fiscal year equal to 25% of the excess net capital appreciation attributable to each limited partner's capital account.

16.     In or about November and December 2017, Plandome opened accounts at two brokerage firms, "Brokerage Firm 1" and "Brokerage Firm 2."  Plandome used Brokerage Firm 1 to trade futures contracts, and Brokerage Firm 2 to trade foreign currency.  Plandome's offering memorandum stated that Plandome had a brokerage account at another brokerage firm, "Brokerage Firm 3."  In fact, Plandome never had an account at Brokerage Firm 3.  PAR Capital Partners LLC ("PAR Capital"), another entity controlled by Rinfret, opened two accounts at Brokerage Firm 3 in or about late 2013 and 2014 for trading futures contracts.  Rinfret traded in those accounts from in or about January 2014 through December 2014, and neither account was active after approximately July 2015.

## FACTS

17.     Rinfret raised at least $19.3 million in a multi-year offering fraud scheme. Through Plandome LLC and otherwise, Rinfret fraudulently induced at least five individuals to invest in Plandome by falsely representing that he would use their investments in Plandome to trade futures contracts tied to the S&P 500 index.  Plandome's investment objective was described in its offering memorandum as "the capital appreciation of its client's assets from trading futures contracts with its proprietary trading methods."

18.     Rinfret used only a portion of the money he raised from investors to engage in trading and instead misappropriated a significant amount of the investment proceeds to pay a

host of personal expenses, including the purchase of luxury goods and high-end vacation rentals, and to pay back earlier investors.

19.     Moreover, despite regularly losing money in the limited trading that did occur, Rinfret reported glowing performance results to these investors each month in fabricated account statements, causing them to invest additional money in Plandome.

**Misrepresentations About Plandome's Performance**

20.     Beginning no later than November 2013 and continuing through at least December 2018, Rinfret fraudulently solicited investments in Plandome through numerous material misrepresentations, including the following:

a.     Rinfret lied about the length and success of Plandome's track record trading S&P 500 futures contracts.  He told investors that he had traded using the strategy continuously starting in January 2012, when in fact he had not begun trading until January 2014, and had done no trading from January 2015 through October 2017.  Rinfret boasted about outsized returns ranging as high as 235% and 362% and told investors his fund never lost money in a single month.  The truth was that Plandome (and PAR Capital, another vehicle Rinfret used to trade S&P 500 futures contracts in 2014) regularly lost money month after month.

b.     Rinfret lied about Plandome's assets under management, telling investors he managed approximately $25 million in assets.  In fact, Plandome never had more than approximately $8.7 million on hand at any given time.

c.     Rinfret lied about having retained a reputable audit firm (the "Audit Firm") as Plandome's auditor, and told investors a series of lies about the status of the Audit Firm's work. In fact, the Audit Firm was never retained by Plandome or Rinfret.

21.     Rinfret made these material misrepresentations both orally and in writing, including through:

a.   Falsified and fabricated account statements from brokerage firms showing the purported success of the S&P 500 futures strategy—which was in fact regularly losing money— and millions more in assets than Plandome actually had.

b.   Falsified financial statements for Plandome misrepresenting Plandome's assets and profits.

c.   Falsified monthly account statements misrepresenting each investor's purported profits.

d.   Marketing materials showing a false track record and performance history for the S&P trading strategy.

e.   Falsified bank records showing millions of dollars more in the Plandome bank account than there actually was.

f.   Fund offering memoranda falsely stating that the Audit Firm was Plandome's auditor and that Brokerage Firm 3 was one of Plandome's brokerage firms.

22.     At least five investors purchased limited partnership interests in Plandome after Rinfret made these material misrepresentations to them.

*Investor A*

23.     One investor, "Investor A," invested a total of approximately $750,000 with Plandome and Rinfret between approximately March and May 2018.  Rinfret made multiple false representations to Investor A.  For example:

a.   On or about February 19, 2018, Rinfret sent Investor A a monthly account statement from Brokerage Firm 1 for January 2018 which showed a beginning balance of

$5,520,812.57 and a net trading profit of $204,930.70 for the month.  In fact, the beginning

balance of the Brokerage 1 account for that month was far lower—$1,005,819.96—and there

was a net loss that month of $141,563.36.

      b.  On or about February 19, 2018, Rinfret also sent to Investor A an account

statement from Brokerage Firm 3 for January 2018.  This statement was entirely fabricated.

Plandome did not have an account at Brokerage Firm 3 as of January 2018.  Nonetheless, this

fake statement showed a beginning balance of almost $10 million and a profit of over $740,000

for January 2018.

      c.  On or about February 22, 2018, Rinfret sent Investor A a spreadsheet purporting

to show daily trading activity for 2017.  This document represented that Plandome had a gross

annualized investment return of 69.89% in 2017.  Almost every line of this document was false.

Rinfret did not in fact use Plandome to trade the S&P futures strategy from January through

October 2017.

      d.  On or about February 23, 2018, Rinfret sent Investor A a document outlining

gross monthly returns for the S&P 500 futures trading strategy for each month from January

2013 through January 2018.  This document was false.  First, Rinfret was not trading with this

strategy in 2013, or from January 2015 through October 2017.  Second, the spreadsheet showed

significant profits for each month since January 2013.  In fact, Rinfret had regularly lost money

using his S&P 500 futures trading strategy.  Third, the spreadsheet contained false

representations regarding Plandome's assets.  For example, it listed $17 million in assets as of

year-end 2017 when, in fact, Plandome only had approximately $1.8 million at that time.

      e.  On or about March 5, 2018, Rinfret sent to Investor A a February 2018 monthly

statement from Brokerage Firm 1 which, like the January statement, showed far more assets than

Plandome actually had, and a monthly profit of over $117,000 when, in truth, Plandome actually

lost close to $244,000 that month.  Rinfret also sent to Investor A a February 2018 monthly

statement from Brokerage Firm 3 showing over $820,000 in profits for the month, even though

Plandome had no account at Brokerage Firm 3 at that time.

24.     In March and April 2018, after Investor A made an initial $350,000 investment,

Rinfret sent Investor A falsified monthly account statements showing monthly gains of 3.72%

and 5.4%, respectively.  In reality, Plandome lost money in both months.

25.     After receiving these falsified monthly account statements, Investor A invested

another approximately $400,000 in Plandome in or about May 2018.

26.     In the ensuing months, Rinfret continued to send falsified monthly account

statements to Investor A, showing gains on Investor A's investments, when in fact Plandome was

losing money almost every month.

27.     In or about September 2018, Investor A asked for a status update on the purported

audit.  Despite the fact that Rinfret and Plandome had not retained the Audit Firm, Rinfret told

Investor A that the audit should be completed by the middle of October.  In November, Rinfret

informed Investor A and other investors that the work of the Audit Firm had been delayed

because of an issue with the Audit Firm and would be completed by the end of the month.  In the

ensuing months, Rinfret continued to evade and lie about the status of the audit.  In reality,

Rinfret had never retained the Audit Firm.

### Investor B

28.     A second investor, "Investor B," invested approximately $2.9 million with Rinfret and Plandome between approximately May and December 2018.  Before making an initial investment of $700,000 in late May and early June 2018, Investor B received:

    a.  Falsified monthly statements from Brokerage Firm 1 and Brokerage Firm 3 for January 2018 and February 2018.

    b.  Falsified gross monthly returns for the S&P futures trading strategy dating back to January 2013.

    c.  Falsified daily trading activity for the S&P futures trading strategy for 2017.

29.     In or about July 2018, Rinfret sent Investor B a falsified account statement for June 2018 showing a 4.9% increase in his investment that month, when in fact Plandome once again lost money in June.  Later in July, Investor B invested another approximately $450,000 with Plandome.

30.     In the ensuing months, Rinfret continued sending Investor B falsified monthly account statements showing substantial profits, and Investor B continued to invest in Plandome, adding another approximately $1.8 million through December 2018.

### Investor C

31.     A third investor, "Investor C," made an initial $1 million investment in or about February 2018 after receiving oral representations from Rinfret (on at least one phone call on or about February 5, 2018) about the profitability of Plandome's S&P trading strategy.

32.     After receiving from Rinfret falsified account statements for February and March 2018 reflecting gains of 2.91% and 5.92% respectively (when in fact Plandome lost money both months), Investor C decided to invest another $4 million in or about April 2018.

33.     Rinfret continued to send Investor C falsified monthly statements showing substantial gains on Investor C's $5 million investment.

**Investor D**

34.     A fourth investor, "Investor D," invested approximately $7.3 million with Plandome and Rinfret between approximately May 2016 and August 2018.  Rinfret made numerous misrepresentations to Investor D before Investor D made an initial investment.  For example:

a.     On or about May 9, 2016, Rinfret sent promotional materials to Investor D representing that Plandome has "developed a trading strategy that was tested for five years and has been traded since January 2012."  The documents represented that Plandome had a total net return of 362% from January 2012 through April 2016, and compared these returns to the top five performing mutual funds.  While Rinfret (through PAR Capital) had traded S&P 500 futures contracts in 2014, there was no performance history from January 2012 through December 2013, or from January 2015 through April 2016.  Moreover, PAR Capital's trading in 2014 was anything but successful—the fund lost money each month.

b.     On or about May 9, 2016, Rinfret sent Investor D a "sample monthly client report" that showed sizeable profits from January through April 2016.  Again, Rinfret was not even trading S&P futures in 2016.

35.     After Rinfret made these misrepresentations, Investor D made an initial $1 million investment on or about May 20, 2016.

36.     Four days later, Rinfret communicated by e-mail to Investor D: "I will start trading your money today."  Rinfret did not trade any of Investor D's money.  Plandome did not even open a brokerage account to trade S&P 500 futures until approximately November 2017.

37.     Nonetheless, Rinfret sent monthly account statements to Investor D showing phony profits on his investment in Plandome.  Investor D continued to invest in Plandome, adding another approximately $4 million in investments between approximately July and September 2016.

38.     As further described below, Rinfret did not use any of these funds to trade, and instead misappropriated the money for personal use and to pay back other investors.

39.     Still, Rinfret sent Investor D falsified statements showing outsized returns on his Plandome investment.  Investor D invested another approximately $2.3 million in Plandome in 2017 and 2018.

40.     Rinfret made other misrepresentations to Investor D.  For example, after Investor D insisted that Rinfret retain an auditor to conduct periodic audits of Plandome, Rinfret repeatedly made misrepresentations to Investor D about having retained the Audit Firm and about purported delays and issues with the Audit Firm's work.

41.     Moreover, Rinfret produced to Investor D falsified trading account statements from Brokerage Firm 1 and Brokerage Firm 2, showing far more money and far greater profits in those accounts than Plandome actually had.  For example, a falsified December 2018 Brokerage 2 statement showed an opening balance of over $21 million and trading profits of $1.2 million for the month.  In fact, the Brokerage 2 trading account had $4.2 million and showed no trading for December 2018.

42.     On at least one occasion, Rinfret pretended to place a call to Brokerage Firm 2 with Investor D on the line to reassure Investor D about the accuracy of the account information, and Rinfret arranged for someone to impersonate a representative of Brokerage Firm 2 who corroborated the phony account information.

*Investor E*

43.     A fifth investor, "Investor E," invested approximately $3.3 million with Plandome and Rinfret starting in or about December 2013 and continuing until approximately May 2018. Investor E made an initial $50,000 investment in Plandome based on oral and written misrepresentations by Rinfret in or about November and December 2013 about the success of his trading strategy.

44.     Investor E invested another $50,000 in 2014 after receiving falsified monthly account statements from Rinfret showing consistent profits, when in fact Rinfret's strategy lost money in every month in 2014.

45.     In 2015, in an effort to obtain additional funds from Investor E, Rinfret made a series of other misrepresentations to Investor E, including in a document stating that PAR Capital's equity index futures contract strategy had a "total return of 235% from January 2012 through April 2015" and "forty consecutive profitable months."  In fact, that trading strategy was only in effect from January through December 2014, and consistently lost money every month.

46.     In 2015, Rinfret also sent Investor E falsified monthly account statements from Brokerage Firm 3 for February through April 2015 showing successful S&P 500 futures trading. These statements were entirely fabricated.

47.     Investor E invested approximately $3.2 million with Plandome between approximately April 2015 and May 2018.

**Misuse of Offering Proceeds**

48.     From late 2013 through 2018, Plandome raised at least $21.9 million from investors (including approximately $19.3 million from the five investors discussed above). During this time period, only approximately $11.7 million was transferred by Rinfret to a brokerage trading account.  But Rinfret did not trade all of the $11.7 million.  Instead, he

transferred approximately $8.6 million back to Plandome from the brokerage accounts. Rinfret traded—and lost—$3.1 million.

49.     The remaining approximately $18.7 million of investor funds (other than the approximately $3.1 million Rinfret lost trading) was used by Rinfret:

a.     To pay living and other personal expenses from the Plandome account. For example:

i.     Rinfret paid at least $30,000 for a lavish engagement party for his son at a Manhattan restaurant complete with a custom photo wall with the hashtag #RinfretAllDay;

ii.     he paid approximately $50,000 for a South Hampton vacation home rental;

iii.     he paid close to $35,000 for custom kitchen cabinets;

iv.     he spent approximately $170,000 of Plandome funds on jewelry, watches, and cars;

v.     he spent over $105,000 on wine and other alcohol, approximately $12,000 on cigars, and over $130,000 at restaurants;

vi.     he withdrew almost $570,000 in cash from the Plandome account, including over $500,000 in ATM withdrawals; and

vii.     he used the Plandome account to pay for mundane everyday expenses such as dry cleaning, gas, car wash, gym membership, DMV and AAA fees, as well as student loan payments, eye glasses, tanning, and shoe store purchases.

b.     To make payments to family members from the Plandome account. For example:

> i.   Rinfret transferred at least $845,000 to two companies controlled by his
>      wife; and
>
> ii.  Rinfret paid at least $325,000 to his son, and at least $675,000 to his son-
>      in-law.

c.   To pay back other Plandome investors.  For example, Rinfret paid back a total of $8.3 million to four of the five investors described herein.

50.     Rinfret effectively used the Plandome account as his own personal piggy bank without ever disclosing to investors that he was using their money for anything other than purportedly engaging in futures or currency trading.

### Additional Deceptive Conduct in Furtherance of the Scheme

51.     In addition to his misrepresentations to investors, Rinfret provided false documents to and otherwise deceived at least three brokerage firms and a bank in furtherance of the offering fraud scheme.

52.     Because he had been previously sanctioned by the New York Stock Exchange, Rinfret was unable to open an account at Brokerage Firm 3 using his own name.  In 2013, PAR Capital—an entity controlled by Rinfret and purportedly used by Rinfret to trade S&P 500 futures contracts with investor funds—opened a brokerage account at Brokerage Firm 3 using the names of two of Rinfret's family members.  Among the documents submitted to Brokerage Firm 3 was a PAR operating agreement showing those two family members as the members of PAR Capital.  Rinfret's name did not appear on any of the documents.

53.     PAR Capital opened a second account at Brokerage Firm 3 in 2014 using the same two family members' names.  Although one of these individuals died in or about June 2014, the Brokerage Firm 3 account statements continued to go to that individual's address

through 2016.  Rinfret frequently called Brokerage Firm 3 on his cell phone after that individual's death and pretended to be the deceased individual.

54.     Similarly, Rinfret caused Plandome to open an account at Brokerage Firm 1 in or about November 2017 using the names of two of his adult children.  Rinfret caused Plandome to submit to Brokerage Firm 1 a limited partnership agreement falsely listing one of his children as the general partner and another one of his children as the limited partner.  The address and phone number on the account belong to Rinfret.  In multiple phone calls with the introducing broker, Rinfret pretended to be his son.

55.     Rinfret submitted the same Plandome partnership agreement to open a brokerage account at Brokerage Firm 2 in or about December 2017, listing two of his children as partners. Again, Rinfret made multiple phone calls from his cell phone to Brokerage Firm 2, each time pretending to be his son.  He also misrepresented to Brokerage Firm 2 that Plandome traded only his own family's personal funds.

56.     Likewise, in documents submitted to a bank to open two accounts in the name of Plandome, Rinfret's family members, but not Rinfret himself, are falsely listed as Plandome's general and limited partners.  Rinfret also misrepresented to the bank that all Plandome funds are "personal" and belong to family members.

**Rinfret's Admissions to Investors**

57.     On or about April 5, 2019, after days of evading Investor C's redemption request, Rinfret confessed part of the fraud to Investor C.  Rinfret told Investor C that he had lost all of the investor money trading, and that "everything was fabricated."  Rinfret described how he would send his son falsified information so that his son could create the fake monthly Plandome account statements.  He then stated that his son did not know about the fraud.  Rinfret never told Investor C about Rinfret's misuse of the investor money for personal purposes.

58.     Rinfret also stated to Investor C that while Rinfret's "systems" had never worked, he had been trading a new algorithm in a simulated account and the new algorithm in fact worked.  Rinfret told Investor C that if Rinfret could raise $1 million, Rinfret could make $1 million per month trading and pay back all of the current investors.  Rinfret also stated that he was trying to raise money from four of his wife's business clients but added, "if I'm going to jail, why drag 4 new ppl into this."

59.     On or about April 12, 2019, Rinfret made similar admissions to Investor E after Investor E made a redemption request.

60.     In or about May and June 2019, Rinfret asked Investor E for an additional $250,000, which Rinfret stated would allow Rinfret to make enough money to pay back investors.  Rinfret stated he had already raised $250,000 from another person.  When Investor E asked for proof of that fact, Rinfret sent Investor E a bank statement that showed an incoming $250,000 wire transfer on or about May 17, 2019.  The bank statement was false.  No such transfer occurred.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 17(a) of the Securities Act
### (Rinfret and Plandome LLC)

61.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 60, as though fully set forth herein.

62.     By reason of the foregoing, Defendants Rinfret and Plandome LLC directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, knowingly or recklessly have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engaged in transactions, practices and

courses of business which operated or would have operated as a fraud or deceit upon purchasers.

63.     By reason of the foregoing, Defendants have violated, and, unless enjoined, will

continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Rinfret and Plandome LLC)

64.     The Commission repeats, realleges and incorporates by reference paragraphs 1

through 60, as if fully set forth herein.

65.     By reason of the foregoing, Defendants Rinfret and Plandome LLC directly or

indirectly, singly or in concert, by the use of the means and instrumentalities of interstate

commerce or of the mails, in connection with the purchase or sale of securities, knowingly or

recklessly have:  (a) employed devices, schemes, or artifices to defraud, (b) made untrue

statements of material fact and omitted to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, and

(c) engaged in acts, practices, and courses of business which operated or would operate as a

fraud or deceit upon other persons.

66.     By reason of the foregoing, Defendants have violated, and, unless enjoined, will

continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5  [17

C.F.R. § 240.10b-5] promulgated thereunder.

## THIRD CLAIM FOR RELIEF
### Relief Liability for Plandome

67.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 60, as if fully set forth herein.

68.     Plandome obtained substantial illicit profits as a result of the fraudulent activities

of Rinfret and Plandome LLC. Plandome was the recipient of such ill-gotten gains under circumstances in which it is not just, equitable, or conscionable for it to retain the illegal proceeds. Consequently, Plandome has been named as Relief Defendant for the amount of such proceeds by which it has been unjustly enriched as a result of the fraudulent scheme and misrepresentations described in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the Commission a Final Judgment:

### I.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder as alleged herein.

### II.

Directing each of the Defendants to disgorge all ill-gotten gains, and ordering each of them to pay prejudgment interest thereon.

### III.

Ordering each of the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering Relief Defendant Plandome to disgorge all ill-gotten gains and to pay prejudgment interest thereon.

V.

Granting such other and further relief as the Court may find appropriate or necessary for the benefit of investors.

Dated:  June 28, 2019
      New York, New York

                                           Respectfully submitted,

                                           Marc P. Berger
                                           Lara Shalov Mehraban
                                           George N. Stepaniuk
                                           Christopher J. Dunnigan
                                           Ladan F. Stewart
                                           New York Regional Office
                                           SECURITIES AND EXCHANGE
                                             COMMISSION
                                         200 Vesey Street, Suite 400
                                         New York, New York 10281
                                         (212) 336-0061 (Dunnigan)

                                         *Attorneys for the Plaintiff*