USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/9/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Securities and Exchange Commission,

Plaintiff,

–v–

Paul A. Rinfret; Plandome Partners LLC,

Defendants.

19-cv-6037 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

The Securities and Exchange Commission brings this civil-enforcement action against Paul Rinfret and Plandome Partners LLC. The SEC alleges that Defendants engaged in a years-long scheme to defraud investors, resulting in millions of dollars of losses. Rinfret is alleged to have enticed investors by making false representations about his fund's investing history and its assets under management, to have provided investors fabricated financial statements showing large profits from trading that either never occurred or had in fact resulted in substantial losses, and finally to have used most of the investors' money to furnish his and his family's lavish lifestyle.

Rinfret and the general partner of his investment fund, Plandome LLC, never appeared in this litigation. The SEC has thus moved for default judgment. The Court concludes that default judgment is warranted against both Defendants for violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5. The Court further orders supplemental briefing on how recent developments in Rinfret's parallel criminal proceeding in this District affects the relief the SEC seeks here.

1

## I. BACKGROUND

### A. The Allegations

The following facts are taken from the complaint and, for purposes of this motion for default judgment, are assumed to be true. Fed. R. Civ. P. 8(b)(6); *see Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993) (defaulting defendant is deemed to have admitted all well-pleaded allegations in the complaint regarding liability).

For years, Defendant Paul Rinfret served as the Chief Investment Officer and Portfolio Manager of Plandome, an investment fund. Compl. ¶¶ 13–15. Plandome LLC, another Defendant, is the general partner of Plandome. *Id.* ¶ 14. From 2013 to 2018, Rinfret solicited investments for Plandome by selling partnership interests in the fund. *Id.* ¶ 2. Rinfret informed outside, non-family investors that "their money would be used by Plandome to conduct trading in S&P 500 futures contracts and foreign currency." *Id.* To solicit these investments, Rinfret made numerous representations about Plandome's track record of performance, trading strategy, assets under management, and what Rinfret actually intended to do with the investors' money. *Id.* Specifically, Rinfret told investors that Plandome's "proprietary [trading] algorithm . . . had generated triple-digit returns as high as 362% for Plandome investors over a multi-year period, and that Plandome had never lost money in a single month since 2012." *Id.* ¶ 3. And Rinfret claimed that Plandome had about $25 million in assets under management. *Id.* ¶ 4. Rinfret was successful at soliciting investment—at least five investors ponied up almost $20 million. *Id.*; *see also id.* ¶ 17.

Rinfret's representations, however, were false. Rinfret's investing strategy did not have a proven, years-long track record. *Id.* ¶ 4. To the contrary, he had not traded for several years. *Id.* ¶ 20. The small amount of trading that Rinfret did actually engage in was unsuccessful; indeed,

he, Plandome, "and PAR capital, another vehicle Rinfret used to trade S&P 500 futures contracts . . . lost money month after month." *Id.* ¶¶ 4, 20.  Rinfret did not manage $25 million, as he had told investors, or any amount close to it. *Id.* ¶¶ 4, 20.b (Plandome never managed more than about $9 million).  And Rinfret lied about retaining "a reputable audit firm . . . as Plandome's auditor, and told investors a series of lies about the status of the Audit Firm's work.  In fact, the Audit Firm was never retained by Plandome or Rinfret." *Id.* ¶ 20.c.

Rather than invest the millions of dollars he obtained from investors, Rinfret used the money to fund his own lavish lifestyle. *Id.* ¶ 5.  He spent the money on "personal living expenses and extravagant vacation rentals, lavish parties, jewelry and other luxury goods, [to] make payments to family members, and [to] pay back earlier investors who sought redemptions." *Id.*; *see also id.* ¶¶ 18, 49 (cataloging Rinfret's use of the proceeds, including spending "at least $30,000 for a lavish engagement party . . . $50,000 for a South Hampton vacation home rental . . . $170,000 of Plandome funds on jewelry, watches, and cars . . . $130,000 at restaurants . . . withdraw[ing] almost $570,000 in cash . . . [and] usin[ing] the Plandome account to pay for mundane everyday expenses, such as dry cleaning, gas, car wash, gym membership . . . ."). Rinfret also used the funds to make payments, including almost $1 million to "two companies controlled by his wife" and "at least $325,000 to his son, and at least $675,000 to his son-in-law." *Id.* ¶ 49.b.  As to the relatively little money he did not spend on such expenses, Rinfret engaged in unsuccessful trading and paid back other investors. *See id.* ¶¶ 48, 49.c.  "Rinfret effectively used the Plandome account as his own personal piggy bank without ever disclosing to investors that he was using their money for anything other than purportedly engaging in futures or currency trading." *Id.* ¶ 50.

To make matters worse, Rinfret often sent his investors fabricated monthly account statements, showing large profits from trading "that either never occurred or had in fact resulted in substantial losses." *Id.* ¶ 5. These fabrications were coupled with a host of other falsehoods, including falsified bank records "showing millions of dollars more in the Plandome bank account than there actually was" and false fund-offering memoranda. *Id.* ¶ 21. And "[i]n addition to his misrepresentations to investors, Rinfret provided false documents to and otherwise deceived at least three brokerage firms and a bank in furtherance of the offering fraud scheme." *Id.* ¶ 51.

In 2019, Rinfret's scheme fell apart, in part because many investors simultaneously sought to cash out. *Id.* ¶ 7. Faced with redemption requests he could not pay, Rinfret admitted "part of his fraud to at least two investors," telling them that he had lost all of Plandome's money trading, that his proprietary algorithm had never worked, and that he had been sending falsified account statements to investors all along. *Id.*; *see also id.* ¶ 57 (Rinfret describing to an investor that "everything was fabricated.").

In a parallel criminal proceeding, the United States Attorney's Office for the Southern District of New York has charged and arrested Rinfret on charges of wire fraud and securities fraud. *See United States v. Rinfret*, 19-cr-535 (S.D.N.Y.) (GHW). In October 2019, Rinfret pled guilty one count of securities fraud and one count of wire fraud. Crim. Dkt. No. 32. On September 29, 2020, Judge Gregory H. Woods sentenced Rinfret to 63 months' imprisonment and ordered him to forfeit about $20 million.

### B. This Case

In June 2019, the Securities and Exchange Commission filed this action. Dkt. No. 1. The SEC named as Defendants Rinfret and Plandome LLC. *Id.* ¶¶ 13–14. The SEC also named Plandome as a relief defendant, but later voluntarily dismissed its claims with prejudice against

that entity, because Plandome "is defunct and holds no meaningful assets in its name." Dkt. No. 34 at 1–2; Dkt. No. 35 (notice of voluntary dismissal under Fed. R. Civ. P. 41(a)(1)(A)(i)). The SEC alleges that Rinfret and Plandome LLC violated § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5. Compl. ¶¶ 61–66.

The SEC filed certificates of service for all Defendants in July 2019. However, no Defendant ever appeared in this case. The Clerk of Court thus entered certificates of default in October. Dkt. Nos. 21–23. The SEC then moved for default judgment, and served its moving papers on Defendants. Dkt. Nos. 26 (motion), 30 (affidavit of service). This motion is now before the Court.

## II. LEGAL STANDRD

Federal Rule of Civil Procedure 55 sets out a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default, and the entry of a default judgment. *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005). The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *City of New York v. Mickalis Pawn Shop*, LLC, 645 F.3d 114, 128 (2d Cir. 2011); Fed. R. Civ. P. 55(a). The second step, entry of a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted" by the pleadings. *Mickalis Pawn Shop*, 645 F.3d at 128; *see also* Fed. R. Civ. P. 54(c).

Whether entry of default judgment at the second step is appropriate depends upon whether the allegations against the defaulting party are well-pleaded. *See Mickalis Pawn Shop*, 645 F.3d at 137. Once a party is in default, "a district court must accept as true all of the factual

allegations of the non-defaulting party and draw all reasonable inferences in its favor." *Belizaire v. RAV Investigative and Sec. Servs., Ltd.*, 61 F. Supp. 3d 336, 344 (S.D.N.Y. 2014). But because a party in default does not admit conclusions of law, the Court must determine whether the plaintiff's allegations are sufficient to establish the defendant's liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). The legal sufficiency of these claims is analyzed under the familiar plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the movant's favor. *Belizare*, 61 F. Supp. 3d at 344. In other words, "just because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." *Mktg. Devs., Ltd. v. Genesis Imp. & Exp., Inc.*, No. 08-cv-3168, 2009 WL 4929419, at *2 (E.D.N.Y. Dec. 21, 2009).

Still, a party's default "is not considered an admission of damages." *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158 (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)). Therefore, "[i]f the defaulted complaint suffices to establish liability, the court must conduct an inquiry sufficient to establish damages to a 'reasonable certainty.'" *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). A court may make this determination based upon evidence presented at an inquest hearing or upon a review of detailed affidavits and documentary evidence. *See* Fed. R. Civ. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991). While the Court may hold an inquest, the Second Circuit has consistently held that doing so is not necessary. *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) ("By its terms, [Rule] 55(b)(2) leaves the decision of whether a hearing is necessary to the discretion of the district court."); *accord Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir.

6

1993) (district courts have discretion to determine whether an inquest need be held); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991) (noting that Rule 55(b)(2) "allows but does not require . . . a hearing"). "Where, on a damages inquest, the plaintiff makes a damages submission and the defaulting defendant makes no submission in opposition and does not request a hearing, the court may determine the adequacy of the plaintiff's damages claim based on its submitted proofs." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012) (collecting cases).

### III.   DISCUSSION

#### A.   Default Judgment on Both Claims Is Warranted

Because the Clerk of Court has certified that Defendants have failed to answer the Complaint, they are in default. The Court thus considers whether the Complaint's allegations, accepted as true, establish liability and warrant entry of default judgment.

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (2012). To maintain a private securities action under § 10(b) of the Exchange Act and SEC Rule 10b–5, a plaintiff must demonstrate that defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). The requirements for Section 17(a) apply only to a sale of securities and are in other respects the same as Section 10(b) and Rule 10b–5, except that "no showing of scienter is required for the SEC to obtain an injunction under [Section 17] (a)(2) or (a)(3)." *Id.*; *accord SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013)

7

A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *TSC Indus., Inc. v. Northway, Inc.* 426 U.S. 438, 449 (1976); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). A plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)). Scienter may be established by showing either: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 586 (S.D.N.Y. 2011) (internal citations omitted). When determining whether Plaintiffs alleged a strong inference of scienter, a court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The scienter of Rinfret, who controlled Plandome LLC, may be imputed onto it. *See, e.g.*, *SEC v. Treadway*, 430 F. Supp. 2d 293, 337 (S.D.N.Y. 2006) ("It is settled that the scienter of executives can be imputed to corporate entities." (citations omitted)).

Here, the SEC has satisfied each element of its two claims. As discussed, the SEC has put forward well-pleaded allegations—which the Court must accept as true on this posture—that Rinfret and Plandome LLC made countless misrepresentations to entice investors into investing in Plandome LP. Among other misrepresentations, Defendants lied about the length and success

8

of Plandome's trading track record, stretched how long Plandome had been using a strategy, boasted about outsized returns, lied about how many assets the firm had under its management, and told investors his fund had never lost money in a single month. Compl. ¶ 20. None of these statements were true. *Id.* And they were certainly material. For example, Rinfret's representations that his fund had, through a proprietary trading algorithm, managed to generate returns of 235%–362% over the past years and had never lost money "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *TSC Indus.*, 426 U.S. at 449. *See, e.g.*, *SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) (finding misrepresentations regarding potential returns material); *SEC v. Roor*, 99-cv-3372, 2004 WL 1933578, at *306-07 (S.D.N.Y. Aug. 30, 2004). The same is true of Rinfret's false representation regarding how many assets the fund managed. *See SEC v. Nadel*, 97 F. Supp. 3d 117, 123 (E.D.N.Y. 2015) ("[A]ny reasonable investor would consider the accurate amount of assets under management to be a material fact to consider before investing."). Rinfret made these representations knowingly—he was the one fabricating the financial records, after all—and then knowingly misappropriated the funds for his personal benefits. Finally, all of the representations were in connection with the Defendants' offer and sale of their securities (i.e., their sale of limited partnership interests in Plandome LP). The SEC has therefore satisfied all elements of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5, and thus established that default judgment is warranted on both their claims.

### B. The Commission is Entitled to Injunctive Relief

Having established liability, the Court next considers the relief to which the SEC is entitled. To start, the Commission asks that the Court permanently enjoin Rinfret and Plandome LLC from committing future violations of the Securities Act and the Exchange Act. Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize courts to issue

injunctive relief upon a showing that (1) violations of the securities laws have occurred and (2) a reasonable likelihood exists that violations will occur in the future. *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978). To determine whether a reasonable likelihood of recurrent violations exists, courts generally consider factors like (1) the egregiousness of the conduct, (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved, (4) the sincerity of the defendant's assurance against future violations; and (5) the defendant's recognition of the wrongful nature of his conduct. *See SEC v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998); *SEC. v. Syndicated Food Servs. Int'l, Inc.*, No. 04-cv-1303 (NGG), 2010 WL 4668777, at *1 (E.D.N.Y. Nov. 9, 2010)

These factors cut in favor of granting injunctive relief here. As the Court has laid out, the Commission's allegations, taken as true, reveal egregious misconduct. Rinfret and Plandome LLC engaged in an years-long, multi-faceted fraud to fleece investors out of millions of dollars, covered up their fraud by fabricating financial records that showed that they were generating substantial monthly profits, and then used those funds for their personal benefit. *See* Compl. ¶¶ 1–7. This is a quintessential example of securities fraud, not isolated to a small number of instances, and involves significant scienter. And because Defendants have not appeared in this litigation, despite being properly served with both the Complaint and the SEC's default-judgment papers, there is no representation before this Court that this conduct will not reoccur or that Defendants have recognized the wrongful nature of their behavior. The Court therefore grants the SEC's request and enjoins Rinfret and Plandome LLC from committing future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5. *Accord Syndicated Food Servs.*, 2010 WL 4668777, at **1–2 (on similar facts, finding that defendant's "conduct establishes a reasonable likelihood of future violations").

### C. The Commission is Entitled to Disgorgement, Prejudgment Interest, and Civil Penalties

The Court finally considers the SEC's request for disgorgement, interest, and civil penalties, and concludes that the SEC is entitled to all three forms of relief.

*Disgorgement*. Disgorgement is an equitable remedy designed to compel defendants to "give up the amount by which [they] were unjustly enriched." *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987). "[D]isgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court." *Cavanagh*, 445 F.3d at 117. In a recent decision, the Supreme Court reaffirmed the power of the Commission to seek, and district courts to grant, "a disgorgement award that does not exceed a wrongdoer's net profits . . . ." *Liu v. SEC*, 140 S.Ct. 1936, 1940 (2020).

The Court has broad discretion in calculating the amount defendants should pay in disgorgement. *See First Jersey Sec.*, 101 F.3d at 1474–75. The SEC is not required to establish with certainty the disgorgement amount, but need only present a "reasonable approximation of profits causally connected to the violation." *Id.* at 1475 (citation omitted); *see also SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) ("Because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude."). "Disgorgement awards can include both direct pecuniary benefits and illicit benefits that are indirect or intangible. However, because disgorgement does not serve a punitive function, "the disgorgement amount may not exceed the amount obtained through the wrongdoing." S.*E.C. v. Wyly*, 56 F. Supp. 3d 394, 403 (S.D.N.Y. 2014) (cleaned up). Likewise, again because the disgorgement remedy is not punitive, "the securities violation and the allegedly unlawful gains must be causally connected." *Id.* at 404. "Once the SEC has met the burden of establishing a reasonable approximation of the profits

11

causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'" *Razmilovic*, 738 F.3d at 31 (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).

In support of disgorgement, the SEC has submitted a declaration from Douglas Smith, a staff accountant in their New York Office's Division of Enforcement. *See* Smith Decl., Dkt. No. 29. Smith reviewed years of records from several financial institutions—including those from Plandome Partners LP's checking account, savings account, and two brokerage accounts—to determine how much Defendants misappropriated from investors. By analyzing these documents, Smith determined that Defendants received about $21 million from investors, returned about $10 million, and lost about $8 million in trading. *Id.* ¶¶ 4(a)–4(d). In addition, Smith determined that "Rinfret, his family members, and entities affiliated with Rinfret and his family members received approximately $8,463,171.08 in benefits or transfers from Plandome LP. This sum is calculated by subtracting from the $21,504,862.60 [received from investors] the $9,889,523.50 [returned to investors] and the $3,152,168.02 lost [in] trading." *Id.* ¶ 4(e). Attached to Smith's declaration are hundreds of pages of Defendants' financial records, revealing each of their inflows from investors and their many outflows, including Rinfret's use of investor funds on personal expenditures. *See* Dkt. No. 29, 4–463. Reliance on these third-party documents is appropriate "as the defendants' use of forged documents . . . sent to investors renders suspect documents that originate with defendants." Dunnigan Decl., Dkt. No. 28, ¶ 12.

As the SEC explains, "[t]his [$8 million] amount comprises the sums received from investors that Rinfret, misusing his control over the fund's accounts, then spent on personal expenses or transferred to himself, his family members, and entities affiliated with him or his family members, instead of investing those sums on behalf of investors in Relief Defendant

Plandome – i.e., the 'net profits' for Rinfret's violations of the securities laws." Dkt. No. 34 at 2. Because this $8 million constitutes Rinfret's net profits from the fraud, the Court can order it be disgorged. *See Liu*, 140 S. Ct. at 1940. Ordering this disgorgement is consistent with equitable principles, as it was fraudulently obtained from investors and the SEC has represented that it will use almost the entirety of these funds to compensate those same investors.[1] *See* Dkt. No. 34 at 2–3. As the SEC explains, "each investor [would] receive a *pro rata* distribution payment" of the disgorged funds. *Id.* at 3. The Court therefore finds that through the detailed and extensive Smith declaration, the SEC has satisfied its burden to show that these funds constitute a "reasonable approximation of profits causally connected to the violation," *First Jersey Sec.*, 101 F.3d at 1474–75, and orders Rinfret to pay disgorgement of $8,463,171.08. *See also Razmilovic*, 738 F.3d at 31.

***Prejudgment interest***. Next, the Court considers the SEC's request for prejudgment interest on the disgorgement award. The Court has discretion to order payment of prejudgment interest on any disgorged gains. Requiring the payment of interest prevents a defendant from obtaining the benefit of "what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Credit Bancorp, Ltd.*, No. 99-cv-11395, 2011 WL 666158, at *3 (S.D.N.Y. Feb. 14, 2011) (internal quotation marks omitted). "In deciding whether an award of prejudgment interest is warranted, a court should take into account considerations of fairness and the relative equities of the award, the remedial purpose of the statute involved, and/or such other general principles as are deemed relevant by the court." *Wyly*, 56 F. Supp. 3d at 406 (cleaned

---

[1] This remedy may be duplicative of any restitution or forfeiture ordered at Rinfret's criminal sentencing. The SEC thus notes after "the defendant has been sentenced in the criminal case, the Commission will evaluate whether restitution or disgorgement represents the best avenue for returning funds to harmed investors." Dkt. No. 34 at 2–3 (citing *Liu*, 140 S. Ct. at 1948). The SEC may therefore seek to modify the Court's disgorgement remedy at a later date. *Id.* at 3. The Court would look favorably upon such a request and grants the SEC leave to make any such filing.

up) (citing *First Jersey*, 101 F.3d at 1476). "When the SEC itself orders disgorgement, which as discussed above is designed to strip a wrongdoer of its unlawful gains, the interest rate it imposes is generally the IRS underpayment rate." *First Jersey*, 101 F.3d at 1476. Accepting the SEC's well-pleaded allegations as true, many of the same reasons as above counsel in favor of awarding prejudgment interest—the egregiousness of Rinfret's fraud, how long it lasted, and the means he used to perpetrate it, including fabricating many financial documents. Moreover, the Securities and Exchange Acts were designed root out precisely this kind of securities fraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (discussing these statutes' history and purpose); *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 98 (2d Cir. 2017) (same); *SEC. v. Elliot*, No. 09-cv-7594 (KBF), 2012 WL 2161647, at *1 (S.D.N.Y. June 12, 2012) (same). The Court thus concludes that prejudgment interest is appropriate. Accordingly, the Court awards prejudgment interest of $143,051.57 against Rinfret. *See* Dunnigan Decl. ¶ 13.

*Civil penalties*. Lastly, the Court turns to civil penalties. Both the Securities Act and the Exchange Act authorize the Court to impose civil monetary penalties as a result of violations of the securities laws. 15 U.S.C. §77t(d); *Id.* § 78u(d)(3). The amount of the penalty is to be determined "in light of the facts and circumstances," based on a three-tiered penalty scheme. *Id.* §§ 77t(d)(2) and 77u(d)(3)(B).

A first-tier penalty may be imposed for any violation of the underlying statute, a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and a third-tier penalty may be imposed if the requirements for a second-tier penalty are met and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.*; *see*

*also SEC v. Razmilovic*, 738 F.3d 14, 38 (2d. Cir. 2013); *Pentagon Capital Mgmt.*, 725 F.2d at 287–88.  At all three tiers, the penalty for each violation "shall not exceed the greater of (i) [a specified amount for each tier], or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation."  15 U.S.C. §§ 77t(d), 78u(d)(3), 80b–9(e).  The maximum statutory amounts for a natural person and for any other person are: (1) $5,000 and $50,000 at the first tier, (2) $50,000 and $250,000 at the second tier, and (3) $100,000 and $500,000 at the third tier.  *Id.*  These amounts are adjusted for inflation. 17 C.F.R. Ch. II, Pt. 201, Subpt. E; *see also S.E.C. v. GTF Enterprises, Inc.*, No. 10-cv-4258 (RA), 2015 WL 728159, at *2 (S.D.N.Y. Feb. 19, 2015).  For violations prior to November 3, 2015, the statutory per violation maximum third tier penalty amount is $160,000 for individuals, such as Rinfret, and $775,000 for entity defendants, such as Plandome LLC.  For violations after November 3, 2015, the statutory per violation maximum third tier penalty amount is $189,427 for individuals, and $947,130 for entity defendants.  *See* 17 C.F.R. §§ 201.1004, 201.1005; 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).

      Civil penalties are designed to punish the individual violator and deter future violations of the securities laws.  *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).  "Beyond setting maximum penalties, the statutes leave 'the actual amount of the penalty . . . up to the discretion of the district court.'"  *Razmilovic*, 738 F.3d at 38 (quoting *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005).  To inform this discretion, courts consider the so-called *Haligiannis* factors:  "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."  *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (citing *SEC v.*

*Coates*, 137 F. Supp. 2d 413, 429 (S.D.N.Y. 2001); *see also GTF Enterprises*, 2015 WL 728159, at *2.

The Court has already considered most of these factors and does not spill more ink on them here. For the reasons stated above, accepting the Commission's well-pleaded allegations as true (as the Court must), Defendant's actions were egregious, involved significant scienter, and were far from isolated. *See* Compl. ¶¶ 1–7. Defendants' actions also caused significant harm to other persons. As the Complaint details, the Commission has identified five investors who were victims of Defendants' fraud. *See id.* ¶¶ 23–47 (laying out involvement of Investors A, B, C, D, and E). For example, Investor B invested about $2.9 million with Rinfret and Plandome in 2018. *Id.* ¶ 28. Before making the initial investment, Defendants gave Investor B falsified monthly statements, gross monthly returns, and daily trading activity reports. *Id.* And in the months that followed, "Rinfret continued sending Investor B falsified monthly account statements showing substantial profits, and investor B continued to invest in Plandome . . . ." *Id.* ¶ 30. Similarly, Investor D invested about $7.3 million with Plandome and Rinfret over two years, also in reliance on a slew of falsified financial reports and false representations *Id.* ¶¶ 34–42. "On at least one occasion, Rinfret pretended to place a call to Brokerage Firm 2 with Investor D on the line to reassure Investor D about the accuracy of the account information, and Rinfret arranged for someone to impersonate a representative of Brokerage Firm 2 who corroborated the phony account information." *Id.* ¶ 42. Accepting these allegations as true, Defendants' conduct caused several investors significant financial harm. Lastly, Defendants have chosen not to appear in this action, so the Court is not in a position to determine whether their penalty should be reduced due to their present financial condition. These factors therefore cut in favor of imposing third-tier civil penalties, and the Court concludes such penalties are appropriate here. *Accord Elliot*, 2012

16

WL 2161647, at *11 (on similar facts, awarding penalties under the third tier); *Haligiannis*, 470 F. Supp. 2d at 385–86.

The Court must next consider the method by which the penalties should be calculated. As noted, the securities law provide that for *each violation*, the Court may impose a penalty of either the maximum pecuniary gain for each defendant or the statutory maximum penalty as adjusted for inflation, whichever is greater. 15 U.S.C. §§ 77t(d), 78u(d)(3), 80b–9(e). But the statutes do not define the term "violation." *See id.* As Judge Abrams explained in *GTF Enterprises*, courts in this circuit have thus adopted a range of approaches in determining what constitutes a "violation" of these laws. 2015 WL 728159 at *4. For example, some courts have "looked to the number of investors defrauded or the total number of fraudulent transactions," while others have considered "the number of statutes that each Defendant violated, or whether the violations were all part of a single scheme." *Id.* (collecting cases).

As in *GTF Enterprises*, Defendants have failed to defend this action or otherwise appear, and the Court has concluded that entry of default judgment is appropriate. There, Judge Abrams held that "[b]ecause the judgment in this case was entered by default, however, and the Court lacks detailed information about the Defendants' fraudulent conduct, it finds it most appropriate to impose a single penalty against each Defendant for the entirety of the scheme." *Id.* at *5. Judge Abrams thus imposed the maximum statutory penalty against the defaulting defendants. *Id.* For the same reasons, the Court concludes that a one-time, maximum statutory penalty—$160,000 against Rinfret, and $775,000 against Plandome LLC—is appropriate.

### IV.     CONCLUSION

For the reasons stated above, the Court concludes that default judgment is warranted against Defendants for violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act,

17

and Rule 10b-5. *See* Compl. ¶¶ 61–66. The SEC is further entitled to injunctive relief, disgorgement of $8,463,171.08, prejudgment interest of $143,051.57 against Rinfret, and civil penalties of $160,000 against Rinfret and $775,000 against Plandome LLC. This resolves Dkt. No. 26.

On September 29, 2020, Judge Woods sentenced Rinfret to 63 months' imprisonment and ordered him to forfeit $20,268,268.00 to the Government. That same day, Judge Woods also ordered the Government to "promptly submit a proposed order restitution for the Court's consideration. S.D.N.Y. Case. No. 19-cr-535, Minute Entry, September 29, 2020. The SEC has indicated that the Court should abstain from entering judgment until the criminal proceeding against Rinfret concludes. *See* Dkt. No. 34 at 2–3. At the SEC's suggestion, therefore, the Court will not enter judgment at this time. Instead, the SEC is ordered to submit supplemental briefing within two weeks of the completion of Rinfret's criminal proceedings. The SEC shall provide its position on how the court's imposition of forfeiture and/or restitution in the criminal proceeding should shape the final relief in this case. The SEC is also directed to submit updated proposed judgments for the Court's review.

No later than one week from the date of this Opinion, the SEC is directed to serve this Opinion on Defendants and file affidavits of service on the docket.

SO ORDERED.

Dated: November 9, 2020
      New York, New York

_____
ALISON J. NATHAN
United States District Judge